1  Shannon W. Martin
   ASBA No. 0105028
2  GRACE HOLLIS LOWE HANSON & SCHAEFFER, LLP
   One Ridgegate, Ste. 215
3  Temecula, CA 92590
   (951) 676-3445
4  (951) 676-9294- Fax
   smartin@gracehollis.com
5

6  Attorneys for Defendant

7

8              IN THE UNITED STATES DISTRICT COURT

9  FOR THE DISTRICT OF ALASKA AT ANCHORAGE

10

11 DARYL MEADOWS,                )    Case No. 3:05-cv-00032-TMB
                                 )
12              Plaintiff,       )
                                 )
13 vs.                           )    **OPPOSITION TO PLAINTIFF'S**
                                 )    **SECOND MOTION *IN LIMINE* FOR**
14 SCHLUMBERGER TECHNOLOGY       )    **EXCLUSION OF WITNESS AND**
   CORPORATION, a foreign        )    **EVIDENCE**
15 corporation,                  )
                                 )
16              Defendant.       )
   ──────────────────────────────)

17

18      Defendant Schlumberger Technology Corporation hereby opposes

19 plaintiff Daryl Meadows' second Motion and Memorandum *in limine* for

20 Exclusion of Witnesses and Evidence.

21                      **I. <u>Introduction</u>**

22      Plaintiff Meadows seeks an order precluding Schlumberger from

23 introducing evidence in three separate areas (discussed below),

24 yet, astonishingly, plaintiff fails to cite to any statutes, rules,

25 or case law to support his bald theories for exclusion.  Presumably

26 then, plaintiff Meadows would like this Court to grant his motion

27 simply because the evidence he is seeking to exclude is unfavorable

28 to his case.  Plaintiff's Motion *in limine* is doomed by conclusory

                                  1

argument and is absolutely devoid of any legal merit, and must be denied.

## II. **Factual Background**

Mr. Meadows was allegedly injured in an oilfield accident that occurred on October 16, 2003, while employed for Nabors Alaska Drilling, Inc.  Mr. Meadows alleges that he suffers from Complex Regional Pain Syndrome (CRPS I) as a result of this accident.  The nature and severity of his injuries are in dispute as is the extent of Mr. Meadows' physical abilities and limitations, if any, and whether Mr. Meadows is capable of engaging in non-sedentary work.

Mr. Meadows initiated a third-party lawsuit against defendant Schlumberger, alleging that Schlumberger was negligent for causing his injuries.  Schlumberger in turn filed a motion seeking to allocate fault to plaintiff's employer, Nabors, at trial, pursuant to AS 09.17.080, and this Court granted Schlumberger's motion.  *See* Court Order dated October 3, 2005.

### A. **Evidence regarding plaintiff Meadows' prior broken leg and  prior symptoms of cold hands and feet.**

Defendant Schlumberger took plaintiff Meadows' deposition on August 11, 2005.  Regarding the alleged symptoms and chief complaints that Mr. Meadows relates to the oilfield accident on October 16, 2003, Mr. Meadows testified as follows, "I experience pain, burning, the hypersensitivity. *I experience* bruising, swelling, *rapid temperature changes." See* Daryl Meadows deposition transcript, Ex. A hereto, at 36 [emphasis added].

Additionally, Mr. Meadows was asked pointed questions in his deposition about prior symptoms of CRPS, and any and all prior injuries, including whether he had sustained leg injuries or leg

2

1  fractures prior to the oilfield accident on October 16, 2003:

2      Q.    I want to focus on your symptoms.  Okay?
       A.    Uh huh?
3      Q.    And your symptoms are - you've described them.  But
             they're localized would you say between your hip and your
4            foot, basically, of your right leg?
       A.    Yes.
5      Q.    Those symptoms then, in your right leg, had you ever
             experienced before October 16, 2003 -
6      A.    No.
       Q.    -symptoms similar in any degree to that which you began
7            experiencing after that date?
       A.    No.
8      Q.    Had you ever injured your right leg in any form, any
             capacity before October 16, 2003?
9      A.    I have pulled a muscle playing softball and things of
             that nature, but it's - kind of like a mild cramp.  It's
10           no pain that extends.
       Q.    Right.  So just sports-related muscle pulls?
11     A.    Yeah.  Like a cramp, a little pull.  Nothing.
       Q.    Ever any - any fractures to your right leg?
12     A.    No.
       Q.    Ever involved in - I know your - I know that you
13           responded to the question that I asked you [referring to
             plaintiff's discovery responses].
14     A.    Yeah.
       Q.    Describe in detail every bodily injury sustained for
15           which you have sought medical care during your lifetime,
             including in your answer a description of the nature of
16           each injury, the date or dates of its occurrence and the
             extent of recovery that was experienced as of the date of
17           the accident.  You indicated: Fractured left wrist,
             football injury, 1986, brace for three months, treated
18           at...Hilton Hospital Emergency Room...in Oklahoma.
       A.    Yes.
19     Q.    Fractured right wrist, again, football injury, '87,
             another brace, treated at Mercy Memorial?
20     A.    Yes.
       Q.    And right forearm, cut on sheet metal on race car fender.
21     A.    Yes.
       Q.    Have you ever been involved in a motor vehicle accident?
22     A.    No...I've been in, you know, just little minor bumps, but
             no - big collisions or anything, no.
23     Q.    Never been involved in any accident where you were
             ejected from any vehicle?
24     A.    Oh, no.
       Q.    And have you ever had any fractures anywhere on your
25           body?
       A.    No, just the - just the wrists.
26
   *See Id.,* at 38-41 [inserting explanation for context].
27
   ///
28

                                    3

1    The issue of whether Mr. Meadows was previously injured in a

2  motor vehicle accident stems from a treatment record for Daryl

3  Meadows dated January 15, 2004, or roughly three months after the

4  oilfield accident.  In this treatment record, the provider, Sherri

5  Hall, P.T./Director with Ardmore Physical Therapy, documents the

6  following statement into the history section concerning the

7  patient,  plaintiff Meadows: "Patient's past medical history is

8  positive for motor vehicle accident as a teenager including

9  ejection from a vehicle and multiple fractures."  *See* Sherri Hal

10 treatment record, attached hereto as Ex. B.

11   When asked to review and read this treatment record, and in

12 particular, the sentence regarding the prior motor vehicle

13 accident, Mr. Meadows adamantly denied the accuracy of the

14 statement, testifying:

15        A.   That's not true.  My brother was killed in a motor
              vehicle accident, but, no, that's not true for me.
16        ...
          Q.   All right.  So that sentence there, if anything, refers
17             to an accident your brother would have been involved in?
          A.   Yes.
18        Q.   But not you?
          A.   Not me, no.
19        Q.   And Ms. Hall would corroborate that?  She would agree
              with that?
20        A.   Yes.

21 *See* Meadows depo, Ex. A, at 42-43.

22   To be sure, Ms. Hall was deposed on this issue, and testified

23 as follows:

24
          Q.   Now, referring to the January 15, 2004, initial
25             evaluation, I note that the last sentence of the first
              paragraph under History seems to refer to the moving
26             to refer to the moving vehicle accident; is that right?
          A.   Correct.
27        Q.   And it says, "Patients' past medical history is positive
              for motor vehicle accident as a teenager, including
28             ejection from a vehicle and multiple fractures."  Again,

4

| | | |
|---|---|---|
| 1 | | the source of that information is Daryl Meadows. Correct? |
| 2 | A. | Correct. |
| | | ... |
| 3 | Q. | Now, is it possible that Mr. Meadows told you that his brother had been involved in a motor vehicle accident, |
| 4 | | but you just simply misunderstood him to mean that he had been involved in this motor vehicle accident? |
| 5 | A. | No. |

*See* Sherri Hall deposition, Ex. C hereto, at 19, 25.

    **1.   <u>Records establishing that Mr. Meadows experienced prior symptoms of cold hands and feet, and a prior broken leg.</u>**

On June 10, 1997, plaintiff Meadows underwent a medical examination in connection with pre-employment screening for a company called Dolese Bros. Co.  *See* Ex. D hereto.  In the course of this screening, Mr. Meadows responded to a questionnaire in what appears to be his own handwriting, and also signed this questionnaire, stating:

    QUESTIONS TO BE ANSWERED BY APPLICANT
    ...
    2.   What injuries have you had?  ***Broken wrist, arm and leg*** [response is in plaintiff Meadows' handwriting]...

    Did you draw compensation?  No [response is in plaintiff Meadows' handwriting]...

*Id.* [emphasis added; inserting explanation for context]

Additionally, plaintiff Meadows treated at Medical Arts Clinic on October 19, 2001, or roughly two years before the oilfield accident of October 16, 2003.  The treatment record for this visit records the following information: "Poor circulation.  Patient reports hands and feet chronically cold, often times sweaty.  He reports that he was as cold in 68 degree humid weather as he was in Alaska at 8 degrees with dry climate."  *See* Ex. E hereto.

    **2.   <u>Plaintiff's medical expert, Dr. Schade's, review of the medical records and testimony concerning prior conditions.</u>**

Plaintiff's medical expert, Dr. Schade, issued an expert

5

1 report in this matter in November 2005.  *See* Ex. F hereto.  Dr.

2 Schade's expert report contains a listing of all records that he

3 reviewed, including medical records.  *Id.*  Dr. Schade's expert

4 report bears no mention to the medical records from Medical Arts

5 Clinic (Ex. E), or the Dolese Bros pre-employment screening

6 examination questionnaire (Ex. D).

7       In rendering the opinions contained in his expert report, Dr.

8 Schade relied on several medical journal articles concerning CRPS,

9 including one article entitled "An Updated Interdisciplinary

10 Clinical Pathway for CRPS: Report of an Expert Panel."  *See* Ex. G

11 hereto.  Of particular interest in this journal article are the

12 following excerpts:

13     •    We have some doubt as to whether this form of pain ever
            originates at the moment of the wounding...
14
       •    Of the special cause, which provokes it, we know
15          nothing...

16     •    The seat of the burning pain is various; but it never
            attacks the trunk, rarely the arm or thigh, and not often
17          the forearm or leg.  Its favorite site is the foot or
            hand...
18
       •    Autonomic signs and symptoms are swelling, color, and
19          temperature changes, and sweating abnormalities.  The
            majority of patients describe swelling of the affected
20          limb, which can be aggravated by physical load, painful
            stimuli, environmental and local temperature
21          changes...temperature asymmetry between the affected and
            unaffected side measured with infared thermography...Such
22          asymmetry is dynamic and can be warmer or colder.
            Sweating abnormalities were observed in 59% of
23          patients...

24 *Id.,* at pp. 1, 3.

25       On January 18, 2006, plaintiff Meadows' attorney, Mark

26 Colbert, sent a letter to Dr. Schade enclosing medical records from

27 Medical Arts Clinic.  In this letter, Mr. Colbert wrote, "Dear Dr.

28 Schade: To insure you have a complete medical history, I am

6

**OPPOSITION TO PLAINTIFF'S MOTION *IN LIMINE* FOR EXCLUSION OF WITNESS AND EVIDENCE**
**Daryl Meadows v. Schlumberger Technology Corporation (Case No.3:05-cv-00032-TMB)**

1  enclosing to you medical records from from Medical Arts Clinic and

2  in particular one dated October 1, 2001, regarding cold feet and

3  hands." *See* Colbert letter, dated October 18, 2005, Ex. H hereto.

4  By letter dated January 23, 2006, Dr. Schade acknowledged receipt

5  of Mr. Colbert's letter including an acknowledgment that he had

6  reviewed the medical records from Medical Arts Clinic. *See* Dr.

7  Schade letter dated January 23, 2006, Ex. I hereto.

8      Dr. Schade was deposed on February 3, 2006, and was asked to

9  compare the symptoms described in the medical journal article

10  (discussed above) to the symptoms of cold hands and feet described

11  in the medical records from Medical Arts Clinic:

12      Q.  The first sentence is "Autonomic signs and symptoms are
          swelling, color and temperature changes and sweating
13         abnormalities."  It appears from this October 19 record
          that Mr. Meadows was having sweating abnormalities in his
14         hands and feet and exhibiting colder than usual
          temperature, feeling of colder than usual temperature in
15         his hands and feet.  Aren't those symptoms that are
          referred to here?
16      A.  Yes.

17  *See* Dr. Schade discovery deposition, Ex. J hereto, at 40.

18      On the issue of the self-reported prior broken leg, Dr. Schade

19  was asked:

20      Q.  Do you see where it says, "What injuries have you had,"
          and it says, "Broken wrist, arm, and leg"?
21      A.  Yes.
        Q.  Assuming that Mr. Meadows wrote that, for the moment, did
22         you discuss with Mr. Meadows a broken leg that he had
          sustained before October 2003?
23      A.  No.

24  *Id.,* at 41.

25      The plaintiff deposed Dr. Schade on March 30, 2006, for the

26  purpose  of perpetuating his trial testimony.  In this deposition,

27  Dr. Schade testified that he had not issued a supplemental expert

28  report identifying his review and acknowledgment of the additional

7

1   medical records.  *See* Dr. Schade perpetuation deposition, Ex. K

2   hereto, at 83-85.  On cross-examination, Dr. Schade testified  on

3   the issue of cold hands and feet as follows:

4       Q.    Temperature variations in his hands and feet October of
              2001.  I'd like to refer you to the Updated
5             Interdisciplinary Clinical Pathway for CRPS [Ex. F
              hereto]...Isn't is true, Doctor, that one of the precepts
6             in this article, under autonomic signs and symptoms of
              CRPS, is swelling, color, and temperature changes, and
7             sweating abnormalities?
        A.    Yes.
8       Q.    Isn't it also true that this article indicates that CRPS
              is a regional pain syndrome of unclear pathophysiology
9             typically affecting the hand or foot?
        A.    Yes.
10
    *Id.,* at 85-86.
11
        And regarding the issue of the prior (self-reported) broken
12
    leg, Dr. Schade testified that he reviewed the employment
13
    questionnaire from Dolese Bros (Ex. D) for the first time on
14
    February 3, 2006 (during his deposition).  *Id.,* at 87.  Dr. Schade
15
    further testified that he actually confronted Mr. Meadows on these
16
    issues:
17
        Q.    February 3, that would've been the date of your last
18            depo?
        A.    That's correct.
19      Q.    And you've seen Mr. Meadows since then, correct?
        A.    Yes.
20      Q.    Did you ask him about a broken leg?
        A.    Yes.
21      Q.    What did he say?
        A.    He said he remembered it.
22      Q.    He remembered breaking his leg?  Is that what you said,
              Doctor?
23      A.    I showed him the record, and as I recall he didn't deny
              it.
24      Q.    Well, what did he say?
        A.    I don't recall.
25      Q.    Did you document this exchange?
        A.    I'm sorry, I didn't hear you.
26      Q.    Did you document this exchange?
        A.    Let's see.  No I did not.
27      ...
        Q.    Did you ask him about the motor vehicle accident as a
28            teenager.

8

1    A.   No.
     Q.   Did you ask him about the physical therapy note dated
2         January 15, 2004?
     ...
3    A.   No I did not.
     ...
4    Q.   Okay, tell me how that exchange occurred.  You asked him,
          Daryl, here's this record that appears you wrote down,
5         broken leg.  What did he say?
     ... [objection on the record]
6    A.   As I recall, I told him that I had received additional
          medical records, and I asked him about his visits with
7         the doctor that was treating him for the poor
          circulation...And as part of that package, you know,
8         showed him this other  record and also and asked him if
          he had any, you know, long-term affects or problems with
9         those, and he said no.  The conversation lasted maybe 30
          seconds.  That was it.
10   ...
     Q.   He did not deny breaking his leg; is that correct?
11   A.   He neither admitted nor denied.
     Q.   He neither admitted nor denied.  And you didn't inquire
12        any further?
     A.   No.
13
*Id.,* at 89-91.
14
15        **B.    Testimony by Nabors' representative John Haynes regarding
                  fault allocation.**

16        John Haynes is the Health Safety and Environmental (HSE)

17   Manager for Nabors Alaska Drilling, Inc.  Plaintiff noticed a

18   30(b)(6) deposition of Nabors in September 2005, and Nabors

19   designated Mr. Haynes as its corporate representative.  On the

20   issue of fault allocation, plaintiff's counsel inquired with Mr.

21   Haynes as follows:

22        Q.   What percent of fault do you think for – should be
               assigned to Nabors for this incident, from one to a
23             hundred?
          A.   Boy, you know, I don't know if I'm the one to really tell
24             – say who – who's at fault or what amount of
               fault...[objection stated for the record]...I'm an
25             investigator, and I don't try to fix blame or fault or –
               and I – like I said earlier, you know we try to learn
26             from these incidents, you know, we put all the finding
               together  and hopefully we can prevent it from happening
27             again.

28   *See* Nabors' 30b6 deposition, Ex. L hereto, at 82.

**OPPOSITION TO PLAINTIFF'S MOTION *IN LIMINE* FOR EXCLUSION OF WITNESS AND EVIDENCE**
**Daryl Meadows v. Schlumberger Technology Corporation (Case No.3:05-cv-00032-TMB)**

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

### III. <u>Argument</u>

The plaintiff moves the court to exclude evidence in three areas.  Each area is addressed separately below.

### A. <u>Evidence of the prior broken leg and prior temperature variations in the hands and feet does not constitute "collateral impeachment."</u>

Plaintiff's argument for exclusion relies entirely on testimony from his own medical expert, Dr. Schade.  Plaintiff also argues that such evidence is irrelevant, and to the extent that such evidence is relevant to Mr. Meadows' credibility, such evidence would constitute "collateral impeachment," because there is no connection between this evidence and the development of CRPS I.  Motion, at 3, 5.

"The general test of whether evidence is collateral is: 'Could the fact, as to which error is predicated, have been shown in evidence for any purpose independently of the contradiction?'" *United States of America v. Higa,* 55 F. 3d 448, 452 (9th Cir. 1995) (*citing Wigmore on Evidence* § 1003 at 961 (Walter A. Reiser, Jr., revision, 1994).  "This test is easy to state and difficult to apply, so Wigmore suggests that the application of the  rule be left 'largely in the control of the trial court.'" *Id.*

In *Higa* the 9th was deciding the issue of whether a witness could be impeached with an inconsistent statement regarding a collateral matter under Fed. R. Evid. 613 (b).  The Court elaborated, "A collateral contradiction is typically one on a point not related to the matters at issue, but designed to show that the witness' false statement about one thing implies a probability of false statements about the matters at issue." *Id.*  Applying the

10

1    test to the facts at issue in the case, the *Higa* Court held that

2    "Tamon's inconsistencies had to do with whether Higa had wilfully

3    participated in a conspiracy, or refused to participate.  This was

4    the matter charged against Higa and at issue in the trial."  *Id.*

5    Therefore, the court held that the district court did not abuse its

6    discretion by determining that extrinsic evidence of the

7    inconsistent statements should be admitted.  *Id.,* at 453.

8        Here, for starters, Dr. Schade is the plaintiff's paid expert

9    – he is <u>not</u> a treating doctor.  Dr. Schade's biased (and

10   uninformed) testimony regarding the lack of a causal nexus between

11   these prior conditions and the development of CRPS I most certainly

12   does not close the door on this hotly contested issue of fact.

13   After all, Dr. Schade's testimony is entirely based on a discussion

14   that Dr. Schade had with Mr. Meadows regarding the records at

15   issue.  *See* Ex. K, at 89-91 ("I told him that I had received

16   additional medical records, and I asked him about his visits with

17   the doctor that was treating him for the poor circulation...And as

18   part of that package, you know, showed him this other record and

19   also and <u>asked him if he had any, you know, long-term affects or</u>

20   <u>problems with those, and *he said no.*</u>  The conversation lasted maybe

21   30 seconds.  That was it."

22       According to Dr. Schade then, he confronted Mr. Meadows with

23   the records concerning both the prior broken leg and the

24   temperature variations in the hands and feet.  With respect to the

25   prior broken leg, <u>Mr. Meadows remembered this event and did not</u>

26

27

28

**OPPOSITION TO PLAINTIFF'S MOTION *IN LIMINE* FOR EXCLUSION OF WITNESS AND EVIDENCE**
**Daryl Meadows v. Schlumberger Technology Corporation (Case No.3:05-cv-00032-TMB)**

deny it.[1]  Amazingly, Dr. Schade did not write down any notes respecting his conversation with Mr. Meadows on these issues, nor did he issue a supplemental expert report concerning the new records reviewed, nor did he bother to inquire further with Mr. Meadows into the history of the broken leg.  *Id.*

Mr. Meadows tacit admission to Dr. Schade regarding the prior broken leg is contradictory to his sworn testimony regarding prior injuries and prior fractures.  *See* Ex. A, at 38-41.  Additionally, Mr. Meadows testified that the oilfield accident has caused him to experience "rapid temperature changes"  (Ex. A, at 36); conversely, Mr. Meadows denied that he had "ever experienced before October 16, 2003...symptoms similar in any degree to that which [he] began experiencing after that date."  *Id.,* at 39.  Of course, Mr. Meadows sworn testimony is contradicted by the record from Medical Arts Clinic concerning temperature variations in the hands and feet (Ex. E), and Dr. Schade confronted Mr. Meadows with this record as well.  Ex. K, at 89-91.

In light of the various contradictions on the record concerning the prior broken leg and prior symptoms of cold hands and feet, Mr. Meadows has clouded his own credibility, and proven himself to be an unreliable witness.  Therefore, Dr. Schade's expert opinion ruling out a causal nexus between the prior conditions and onset of CRPS I (which is entirely based on a 30-second conversation with Mr. Meadows) is also unreliable.

These facts notwithstanding, evidence of the prior conditions

---

[1]Mr. Meadows statements to Dr. Schade on this issue constitutes a tacit admission under Fed. R. Evid. 801(d)(2)(B) ("a statement of which the party has manifested an adoption or belief in its truth...")

12

will not be introduced purely to discredit Mr. Meadows and Dr. Schade as witnesses. More importantly, such evidence will be introduced for the independent purpose of establishing that Mr. Meadows was experiencing symptoms of CRPS I less than two years before the oilfield accident (*see* Ex. E), and therefore, these pre-existing symptoms cannot be due to the oilfield accident, and must result from some earlier inciting event or condition. Other evidence (*e.g.,* the prior broken leg and mysterious motor vehicle accident ejection) will be offered to show at least one and perhaps two potential causes or inciting events to explain the pre-existing symptoms. Defendant will also have its own medical expert, Dr. Pitzer, corroborate these theories and to establish a lack of causation between the oilfield accident and the onset of CRPS I.

Because Schlumberger has an independent purpose for introducing evidence of the prior broken leg and prior symptoms of cold hands and feet, such evidence cannot, as the plaintiff baldly argues, constitute "collateral impeachment." Motion, at 3, 5.

**B.    It is the province of the jury to assign fault to Nabors, if warranted, pursuant to AS 09.17.080, and sanctions are not warranted.**

Plaintiff argues that "Nabors Alaska Drilling should not be allowed to testify as to any percentage of negligence, since they refused to answer that question at their 30(b)(6) deposition in this case." Motion, at 3.

First, to be clear, Mr. Haynes did not "refuse" to answer the question posed by plaintiff's counsel at his deposition, but simply declined to render an opinion on this issue. *See* Ex. L, at 82. Semantics aside, the question of the appropriate percentage

13

to be assigned to Nabors under AS 09.17.080 and pursuant to this court's Order dated October 3, 2005, is ultimately the province of the jury, and not any particular witness. *See Evans ex rel. Kutch v. State,* 56 P.3d 1046, 1059 (Alaska 2002) ("AS 09.17.080(a) requires <u>the fact-finder</u> to assign fault percentages to all parties to the suit, as well as to non-parties released from liability or 'responsible for the damages.'") (emphasis added).

Moreover, Nabors is not a party to this action, and thus, even if there were some merit to the plaintiff's argument that Mr. Haynes was a recalcitrant witness, excluding testimony from him or any other Nabors' witness under Civil Rule 37 would not be an appropriate sanction in these circumstances. *See e.g. Wasserman v. Bartholomew, et. al.,* 923 P.2d 806, 811 (Alaska 1996) (holding that Alaska R. Civ. P. 37 cannot be the basis for excluding testimony where the recalcitrant witness is not a party).

Additionally, plaintiff did not seek an order compelling testimony from Nabors on the issue of fault allocation, and thus, Nabors was never afforded sufficient opportunity to consider whether to respond to the question posed in Mr. Haynes' deposition, or even whether Nabors was legally required to respond to such a question. Therefore, exclusion would be improper because sanctions precluding witness testimony must be preceded by a prior court order. *See e.g. Id.,* at 812 (holding that exclusion of a recalcitrant witness' testimony was improper where the party seeking exclusion did not seek an order compelling deposition testimony.)

Finally, there is no evidence that Schlumberger encouraged or caused Mr. Haynes to decline to give an opinion on the issue of

14

fault allocation, and it would not be just to impose a sanction against a party that did nothing wrong.  *See e.g. Id.,* at 812.

        **C.**   **<u>Evidence about extent of injuries or failure to return to work by plaintiff's co-worker Kenny Lewis is a moot issue.</u>**

Plaintiff anticipates that defendant Schlumberger will seek to introduce evidence as to the current work status of his injured co-worker, Kenny Lewis.  Motion, at 3-4.  Plaintiff argues that Mr. Lewis "has not returned to work," and that such evidence is not relevant to this matter and could be highly prejudicial to plaintiff Meadows.  Defendant assumes that plaintiff meant to say that Mr. Lewis "has returned to work," as such evidence is distinguishable from Mr. Meadows' current work status, i.e., Mr. Meadows has <u>not</u> returned to work.

Speculation aside as to what plaintiff's chief concerns are in this area, plaintiff's motion to exclude evidence regarding Kenny Lewis' work status is moot, as defendant Schlumberger has already filed its exhibit list (and more recently, an amended exhibit list) and also its witness list.  *See* Defendant's Amended Exhibit List and Final Witness List.  Defendant's exhibit list does not include any documentary evidence regarding Kenny Lewis, and Mr. Lewis is not on defendant's witness list.  Moreover, the Court Order dated March 24, 2006, required the parties to be specific (and not general) in summarizing witness testimony, and defendant has not listed any other witness for the purpose of eliciting testimony regarding Kenny Lewis' work status.

For these reasons, plaintiff's motion to exclude evidence regarding Kenny Lewis' work status is moot.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

### III. <u>Conclusion</u>

For the reasons set forth herein, the plaintiff's second Motion and Memorandum *in limine* for Exclusion of Witnesses and Evidence must be denied.

DATED: <u>August 28, 2006</u>                    GRACE HOLLIS LOWE
                                                HANSON & SCHAEFFER
                                                Attorneys for Defendant

                                        By:    <u>s/ Shannon W. Martin</u>
                                                Shannon W. Martin
                                                One Ridgegate, Ste. 215
                                                Temecula, CA 92590
                                                Telephone:  951-676-3445
                                                Facsimile:  951-616-9294
                                                Email: smartin@gracehollis.com
                                                ASBA No. 0105028

I certify that on August 28, 2006, a copy
of the foregoing was served by ECF on:

Robert A. Sparks  sparkslawoffice@yahoo.com

and by mail on:
Mark Colbert, Esq.

By:    <u>s/Shannon W. Martin</u>
        Grace Hollis Lowe
        Hanson & Schaeffer

**OPPOSITION TO PLAINTIFF'S MOTION *IN LIMINE* FOR EXCLUSION OF WITNESS AND EVIDENCE**
**Daryl Meadows v. Schlumberger Technology Corporation (Case No.3:05-cv-00032-TMB)**