1

```
 1              IN THE UNITED STATES DISTRICT COURT
 2                  FOR THE DISTRICT OF ALASKA
 3   DARYL MEADOWS,            )(
                               )(
 4        Plaintiff,           )(
                               )(
 5   VS                        )( CASE NO.: A05-032-CV
                               )(
 6   SCHLUMBERGER TECHNOLOGY   )(
     CORPORATION,              )(
 7                             )(
          Defendant.           )(
 8
 9
10
          VIDEOTAPED ORAL DEPOSITION OF C.M. SCHADE, M.D.
11
                        MARCH 30, 2006
12
13
14
15        VIDEOTAPED ORAL DEPOSITION OF C.M. SCHADE, M.D.,
16   produced as a witness at the instance of the Plaintiff,
17   and duly sworn, was taken in the above-styled and
18   above-numbered cause on the 30th day of March, 2006,
19   from 2:47 p.m. to 6:44 p.m., before Lisa J. Gretarsson,
20   CSR in and for the state of Texas, reported by machine
21   shorthand, at the offices of Center for Pain Control,
22   2692 W. Walnut Street, Suite 105, located in the city
23   of Garland, state of Texas, pursuant to the Federal
24   Rules of Civil Procedure and the provisions stated on
25   the record.
```

**DEFENDANT'S EXHIBIT**
CASE NO. CV-00032-TMB
EXHIBIT NO. **AB**

**CONDENSED COPY**

EXHIBIT K
PAGE 1 OF 4

**Page 81**

1  BY MR. MARTIN:
2  Q. You've ran us through the initial treatment
3  for Daryl Meadows, and you've said physical therapy,
4  oral medications, nerve blocks you've included, and
5  psychological intervention. What happens after four to
6  six weeks if that treatment fails?
7  A. I thought we -- three months, but four to six
8  weeks would be December. And -- and December 29th,
9  which falls in that window, we're still waiting to
10 complete the initial treatment plan.
11     His EMG is scheduled for 4-1, bone scan
12 has been scheduled, and to continue his cognitive
13 behavioral therapy and biofeedback therapy, continue
14 with physical therapy and his home exercise program.
15 He's scheduled for a lumbar paravertebral sympathetic
16 nerve block and given his medications as needed.
17 Q. What happens after three months if that
18 treatment fails?
19 A. In Daryl Meadows' case, he was scheduled for
20 a trial of spinal-cord stimulation. He's continuing
21 his cognitive behavior therapy and biofeedback therapy,
22 continue his against physical therapy, home exercise
23 program, scheduled for pre-operative psych eval for
24 spinal-cord stimulation.
25 Q. Okay. And what about 12 months if that

**Page 82**

1  treatment fails?
2  A. At 12 months, you have to have a branching
3  decision tree based on the response to the spinal-cord
4  stimulation.
5      In the best-case scenario, the
6  stimulator will control his pain. He will have
7  completed his work hardening and work conditioning. He
8  will have returned to the workforce, and will require,
9  only under other, periodic follow-up for adjustment of
10 his stimulation -- stimulator and his medications.
11     The worse-case scenario, the stimulator
12 will not work. He'll have complications. His CRPS can
13 spread, requiring very intense rehabilitation, high
14 doses of medications, other surgeries.
15 Q. Okay. And these -- these things you've just
16 ran us through, the time line, are things that one
17 would do, a doctor, an expert, such as yourself, if
18 less-invasive treatment fails, correct?
19 A. As I understood your question, yes, you
20 progress from the least -- less invasive, less risky,
21 to the more invasive, higher-risk procedures.
22 Q. What's the date of your expert report?
23 A. November 26, 2005.
24 Q. And what date did Mr. Meadows come visit you
25 for the first time?

**Page 83**

1  A. On November 21st, 2005.
2  Q. Five days earlier?
3  A. Yeah.
4  Q. And in that expert report, you've included
5  everything up to the most invasive type of treatment;
6  isn't that correct?
7  A. Yes.
8  Q. You indicated in your -- that -- that report
9  that we've just referred to, dated November 26th, that
10 Mr. Meadows didn't exhibit the exact -- was not
11 experiencing -- capitalized N-O-T -- any signs or
12 symptoms of complex regional pain syndrome prior to the
13 job injury of October 16th, '03. Is that what you
14 stated in your report?
15 A. Yes.
16 Q. And you were provided, by Mr. Colbert, some
17 records from Medical Arts Clinic on January 18th, '06;
18 is that true?
19 A. Which record are you referring to?
20 Q. (Tenders document.)
21 A. (Reviewing.) Yes, it appears I have the same
22 records.
23 Q. Okay. Those records were not included in
24 your itemization of records that you relied on in your
25 expert report; is that true?

**Page 84**

1  A. That's correct.
2  Q. You wrote a letter back to Mr. Meadows -- not
3  Mr. Meadows -- Mr. Colbert on January 23rd that
4  confirms that you reviewed the Medical Arts Clinic
5  records, and I've included your letter with the stack
6  that I just handed you; is that true?
7  A. Yes.
8  Q. That will be Exhibit H.
9      (Exhibit Number H marked.)
10 BY MR. MARTIN:
11 Q. Mr. Colbert wrote to you on the 18th and
12 said, I'm enclosing to you medical records from Medical
13 Arts Clinic and in particular one dated October 1st,
14 2002, regarding cold feet and hands.
15     MR. COLBERT: Objection.
16 BY MR. MARTIN:
17 Q. Do you see that?
18     MR. COLBERT: It wasn't October 1st,
19 2002.
20 BY MR. MARTIN:
21 Q. October 1st, 2001.
22     Is that what Mr. Colbert was referring
23 you to, Doctor, in that letter?
24 A. I'm sorry, what was the date of the letter?
25 Q. The date of the letter is -- it's the first

### Page 85

1  page of Exhibit H that I handed to you. It's the
2  letter from Mr. Colbert to you, referring you to the
3  Medical Arts Clinic letters and records, and in
4  particular the one dated October 1st, 2001 regarding
5  cold feet and hands.
6      A.   Yes.
7      Q.   And if we refer to the October 1st, 2001
8  record in Exhibit H, it looks like what Mr. Colbert was
9  referring to is a record -- it's Bates stamped DEF 1031
10 on the bottom, for reference.
11          And it says, item two, Poor circulation.
12 Patient reports hands and feet are chronically cold,
13 oftentimes sweaty. He reports that he was in cold --
14 as cold in 68-degree, humid weather as he was in Alaska
15 at eight degrees with dry climate.
16          Do you see that?
17     A.   Yes.
18     Q.   And again, you did not include this record in
19 your list of records referred to in your expert report.
20          MR. COLBERT: Objection: Asked and
21 answered.
22     A.   That's correct.
23 BY MR. MARTIN:
24     Q.   Temperature variations in his hands and feet
25 October of '01. I'd like to refer you to the Updated

### Page 86

1  Interdisciplinary Clinical Pathway for CRPS, Exhibit C.
2          Isn't it true, Doctor, that one of the
3  precepts in this article, under audit -- autonomic
4  signs and symptoms of CRPS, is swelling, color, and
5  temperature changes, and sweating abnormalities?
6      A.   Yes.
7      Q.   Isn't it also true that this article
8  indicates that CRPS is a regional pain syndrome of
9  unclear path of physiology typically affecting the hand
10 or foot?
11     A.   Yes.
12     Q.   You reviewed the Ardmore Physical Therapy
13 records. If I could just refer you to those again.
14 Exhibit A, I believe it is, the third page, the last
15 sentence of the history paragraph. Do you see that
16 sentence?
17     A.   Yes.
18     Q.   Patient's past medical history is positive
19 for motor vehicle accident as a teenager including
20 ejection from a vehicle and multiple fractures.
21          Do you see that, Doctor?
22     A.   Yes.
23     Q.   Did you ask him about that?
24     A.   We have an intake form request that they
25 complete that information.

### Page 87

1      Q.   Did he complete that information?
2      A.   No, he did not.
3      Q.   Okay. I'd like to refer you to what will be
4  Exhibit I.
5          (Exhibit Number I marked.)
6  BY MR. MARTIN:
7      Q.   Have you seen that before?
8      A.   (Reviewing.) Yes.
9      Q.   When did you receive that?
10     A.   9-22-2005, I believe.
11     Q.   9-22-2005?
12     A.   No, I'm not sure. I was looking at a fax
13 date on that.
14     Q.   Okay.
15     A.   This is marked Exhibit B on 2-3, yeah, so
16 February 3rd.
17     Q.   February 3rd, that would've been the date of
18 your last depo.
19     A.   That's correct.
20     Q.   And you've seen Mr. Meadows since then,
21 correct?
22     A.   Yes.
23     Q.   Did you ask him about a broken leg?
24     A.   Yes.
25     Q.   What did he say?

### Page 88

1      A.   He said he remembered it.
2      Q.   He remembered breaking his leg? Is that what
3  you said, Doctor?
4      A.   I showed him the record, and as I recall he
5  didn't deny it.
6      Q.   Well, what did he say?
7      A.   I don't recall.
8      Q.   Did you document this exchange?
9      A.   I'm sorry, I didn't hear you.
10     Q.   Did you document this exchange?
11     A.   Let's see. No, I did not.
12     Q.   And you don't recall anything about that
13 conversation?
14     A.   Not specifically.
15     Q.   Well, generally?
16          MR. COLBERT: Objection: Asked and
17 answered.
18 BY MR. MARTIN:
19     Q.   Do you understand the question?
20     A.   I understand the question. All I recall is
21 that I was curious as to whether these records were
22 correct, and I remember showing it to him, asking him.
23     Q.   And he did not deny breaking his leg.
24     A.   No.
25          MR. COLBERT: Objection: Asked and

C.M. SCHADE, M.D. - March 30, 2006

---

Page 89

```
1   answered.
2   BY MR. MARTIN:
3       Q.  Did you ask him about the motor vehicle
4   accident as a teenager?
5       A.  No.
6       Q.  Did you ask him about the physical therapy
7   note dated January 15th, '04?
8       A.  I'm sorry. What date?
9       Q.  Did you ask him about the physical therapy
10  note that contains that sentence, Past --
11      A.  No, I did not.
12      Q.  Okay. And Mr. Meadows did not tell you,
13  Doctor, any specifics about how he broke his leg?
14          MR. COLBERT: Objection. Assumes he
15  broke his leg. Assumes facts not in evidence.
16      A.  No, he did not.
17  BY MR. MARTIN:
18      Q.  Okay. Tell me how that exchange occurred.
19  You asked him, Daryl, here's this record that appears
20  you wrote down, broken leg. What did he say?
21          MR. COLBERT: Objection: Asked and
22  answered. He's testified that he does not specifically
23  remember the conversation.
24      A.  As I recall, I told him that I had received
25  additional medical records, and I asked him about his
```

Page 90

```
1   visits with the doctor that was treating him for the
2   poor circulation.
3   BY MR. MARTIN:
4       Q.  Okay.
5       A.  And as part of that package, you know, showed
6   him this other record also and asked him if he had any,
7   you know, long-term affects or problems with those, and
8   he said no. The conversation lasted maybe 30 seconds.
9   That was it.
10      Q.  Did you -- did you issue a supplemental
11  report, Doctor?
12      A.  Yes.
13      Q.  And is there any reference in either your
14  original or your supplemental report to the broken leg,
15  the cold hands and feet?
16      A.  No.
17      Q.  And just so I'm absolutely clear for the
18  record, Daryl Meadows did not deny breaking his leg.
19          MR. COLBERT: Objection: Asked and
20  answered.
21          MR. MARTIN: I don't think it's been
22  asked and answered.
23  BY MR. MARTIN:
24      Q.  Can you please clarify for that -- that for
25  the record.
```

Page 91

```
1           MR. COLBERT: Same objection.
2       A.  Just so it's perfectly clear, I did not read
3   each and every item on this page. I merely presented
4   the documents to him, asked him if he remembered them,
5   he admitted that he did. And my concern as a physician
6   is whether or not there were any permanent sequelae
7   from these incidences, and there were not.
8   BY MR. MARTIN:
9       Q.  He did not deny breaking his leg; is that
10  correct?
11      A.  He neither admitted nor denied.
12      Q.  He neither admitted nor denied. And you
13  didn't inquire any further?
14      A.  No.
15      Q.  And -- okay.
16          CRPS is a condition that requires you,
17  as a -- as a doctor specializing in that condition, to
18  rely on what your patients tell you, isn't it?
19      A.  In part, yes.
20      Q.  You ask them questions, they provide you
21  answers, you rely on that in diagnosing your condition,
22  don't you?
23      A.  Yes.
24      Q.  And you relied on what Mr. Meadows had told
25  you up until the date of this exchange that you
```

Page 92

```
1   referred to, correct?
2       A.  Yes.
3       Q.  What was the date of the initial consult
4   again? November 21st, '01? Was that it?
5       A.  11-21-05.
6       Q.  '05. Sorry.
7           Any -- any reference at all up until the
8   time that you had this exchange with Mr. Meadows, any
9   reference at all by Mr. Meadows to you that he had
10  these issues regarding cold hands and feet and a broken
11  leg?
12          MR. COLBERT: Objection: Asked and
13  answered.
14      A.  No.
15  BY MR. MARTIN:
16      Q.  Okay. Now, you talked about -- I think you
17  referred to it as spreading in your direct testimony.
18  Is that -- is that what you referred to, Doctor,
19  spreading? I -- I heard that word and I wanted to ask
20  you about that. Does that sound familiar --
21      A.  Yes.
22      Q.  -- spreading?
23          Okay. What -- what type of spreading
24  have you seen with Mr. Meadows?
25      A.  He has developed unexplained pain in the
```