PLAINTIFF'S EXHIBIT
CASE NO. A05-0032 CV TMB
EXHIBIT NO. 13

C.M. SCHADE, M.D. - March 30, 2006

```
 1              IN THE UNITED STATES DISTRICT COURT
 2                 FOR THE DISTRICT OF ALASKA
 3   DARYL MEADOWS,           )(
                              )(
 4        Plaintiff,          )(
                              )(
 5   VS                       )( CASE NO.: A05-032-CV
                              )(
 6   SCHLUMBERGER TECHNOLOGY  )(
     CORPORATION,             )(
 7                            )(
          Defendant.          )(
 8
 9
10
          VIDEOTAPED ORAL DEPOSITION OF C.M. SCHADE, M.D.
11
                      MARCH 30, 2006
12
13
14
15        VIDEOTAPED ORAL DEPOSITION OF C.M. SCHADE, M.D.,
16   produced as a witness at the instance of the Plaintiff,
17   and duly sworn, was taken in the above-styled and
18   above-numbered cause on the 30th day of March, 2006,
19   from 2:47 p.m. to 6:44 p.m., before Lisa J. Gretarsson,
20   CSR in and for the state of Texas, reported by machine
21   shorthand, at the offices of Center for Pain Control,
22   2692 W. Walnut Street, Suite 105, located in the city
23   of Garland, state of Texas, pursuant to the Federal
24   Rules of Civil Procedure and the provisions stated on
25   the record.
```

*CONDENSED COPY*

PLAINTIFF'S EXHIBIT 13

1

77

1  This is a gradation pattern here of
2  time, and I'd like you to go through and tell us what
3  the treatment course for an individual like Mr. Meadows
4  should be.
5      A.  My medical records speak for themselves.
6      Q.  Uh-huh (affirmative).
7      A.  And if you'll refer to my initial
8  consultation of November 21st, 2005, in answer to the
9  first question, quote, Your initial treatment consists
10 of the following, please check all that apply, I would
11 check physical therapy.
12     Q.  Okay.  That would be within the first --
13 that's initial treatment.  Okay.
14     A.  I would check oral medications, I would check
15 nerve blocks.
16     Q.  Nerve blocks.
17     A.  I would check psychological intervention.
18     Q.  Okay.
19     A.  And then under other, if you look at my plan,
20 items one, two, three, four would apply.
21     Q.  What are you referring to?
22     A.  Plan, number one --
23     Q.  In what?  Under your report?
24     A.  I'm sorry.  I'm referring to office or other
25 outpatient consultations, dated November 21st, 2005.

78

1      Q.  Okay.  At this point, more than two years
2  after the accident -- let me see what you're referring
3  to here.
4          MR. COLBERT:  If you want me to put
5  those in order for you while you continue, I'll do
6  that.
7          MR. MARTIN:  That's okay.
8  BY MR. MARTIN:
9      Q.  Two through four -- I'm sorry.  What items
10 were you referring to there?  I got your November 21 --
11     A.  Okay.  Plan, number one, recommend MRI of the
12 right thigh to rule out ossification; number two,
13 recommend CT right thigh to rule out ossification;
14 number three, recommend bone scan of the right thigh to
15 rule out ossification; and number four, recommend EMG
16 of the right lower extremity to rule out femoral injury
17 and/or denervation.
18     Q.  Okay.  Right.  I see -- okay.  So those are
19 all the radiological studies that you recommended be
20 conducted to rule out things other than CRPS.
21     A.  Some of them are radiological.
22     Q.  Bone scans, nerve studies, CTs, and all those
23 things were done?
24     A.  Yes.
25     Q.  And the physical therapy, is that in there?

79

1      A.  Yes.
2      Q.  Where?
3      A.  Quote, I recommend implementing treatment in
4  accordance with the World Institute of Pain Updated
5  Interdisciplinary Clinical Pathway for CRPS, give the
6  reference.  Quote, there are three domains in
7  treatment, they are rehabilitation, pain management,
8  and psychological therapy, end of quote.
9      Q.  And we've seen what your physical therapy
10 consisted of.  It was on -- it was in that Exhibit that
11 you --
12         MR. COLBERT:  I'm going to object.
13 We've asked and answered that before.
14 BY MR. MARTIN:
15     Q.  -- the Exhibit that you've introduced when we
16 went off record; is that right?
17         MR. COLBERT:  Same objection:  Asked and
18 answered.
19 BY MR. MARTIN:
20     Q.  Clarification.  Is that your Exhibit B?
21     A.  Yes.
22     Q.  Okay.  Okay.  So that's -- that's your
23 initial treatment plan.  What happens if the patient
24 doesn't respond to initial treatment at four to six
25 weeks?

80

1      A.  You proceed with the treatment algorithm.
2      Q.  Okay.  What is that?  It says, Same choices,
3  please check all that apply.  What happens according to
4  the survey and the article?
5      A.  So he was initially seen on 11-21.  Three
6  months later would be February 21.  I don't have my
7  records.  Do you have the -- what's been marked as the
8  records?
9          MR. COLBERT:  That was Exhibit 49.
10         THE COURT REPORTER:  They're down here
11 in the floor.
12         MR. COLBERT:  In the manila folder.
13         MR. MARTIN:  He's ran us through initial
14 treatment.  Now I'm asking what happens after initial
15 treatment, if that fails.
16         MR. COLBERT:  Okay.  Could we go off the
17 record and find those records or put them in order?
18         MR. MARTIN:  I don't have any problem
19 with that.
20         MR. COLBERT:  Okay.
21         THE VIDEOGRAPHER:  We're going off the
22 record at 5:08.
23         (Recess taken 5:08 to 5:11)
24         THE VIDEOGRAPHER:  We're back on the
25 record at 5:11.

30 (Pages 117 to 120)

C.M. SCHADE, M.D. - March 30, 2006

### Page 117

1   MR. MARTIN: E.
2   MR. COLBERT: E. Thanks.
3   BY MR. MARTIN:
4   Q. Under current functioning, On a typical day
5   he may sit outside if the weather is nice, play fetch
6   with his dog, spend time on the computer. He may watch
7   football on TV for fun and occasionally go out to eat.
8   About once a month he may visit friends. He describes
9   his sleep as not good, his appetite as not what it used
10  to be. He can drive himself to destinations but finds
11  it necessary to make frequent stops or to stretch, or
12  to rest or stretch. He also notes he's a little bit
13  nervous when driving in the city.
14          Is that consistent with information?
15  A. Yes.
16  Q. You've not reviewed any videos.
17          MR. COLBERT: Objection: Asked and
18  answered.
19  A. Correct.
20  BY MR. MARTIN:
21  Q. I think I'm just about done.
22          Do you recall the record from Dr. Shah
23  where it's indicated that his leg is shaven?
24  A. Vaguely.
25  Q. Okay. Well, let me give that to you because

### Page 118

1   I'm going to admit it, or use anyway. It's the last
2   report contained in what will be Exhibit M -- I'm
3   sorry, the second-to-last, Mike Shah, M.D. Do you see
4   that?
5   A. I see the report, yes, sir.
6   Q. Okay. Last sentence of history of present
7   illness, can you read that for the jury, please? It's
8   the last sentence of the main paragraph under history
9   of present illness.
10  A. It looks like it says, He denies any previous
11  injury to the right lower extremity.
12  Q. Okay. And on the second page, under physical
13  exam, it says, He's unable to toe-and-heel walk due to
14  pain. Do you see that?
15  A. Yes.
16  Q. Is that consistent with what you understand
17  to be the case?
18  A. Yes.
19  Q. It says, His leg is shaven, in the second
20  main paragraph there in the middle.
21  A. I see that segment.
22  Q. Have you ever noted a similar observation in
23  any of your reports?
24  A. No.
25  Q. It says, There is no atrophy noted. Do you

### Page 119

1   see that?
2   A. Yes.
3   Q. Is that consistent with what you've observed
4   to be the case for Mr. Meadows?
5   A. No.
6   Q. Have you observed atrophy?
7   A. Yes.
8   Q. Clinically significant atrophy?
9   A. Yes.
10  Q. Okay. And where is that documented?
11  A. Outpatient consultation, dated November 21st,
12  2005.
13  Q. Uh-huh (affirmative).
14  A. Under motor examination, it says, quote --
15  Q. What page is that on?
16  A. Page 4 of 5.
17  Q. 4 of 5. Okay. Okay.
18  A. Okay. Under motor exam, Muscle size in lower
19  extremities shows right quadriceps femurus is
20  hypotrophic, measured at 15 centimeters above patella,
21  50 centimeters left quadriceps femurus is measured 15
22  centimeters above patella -- 52 centimeters
23  (unintelligible) --
24          THE COURT REPORTER: Okay.
25          THE WITNESS: Sorry.

### Page 120

1   A. Fifteen centimeters above patella is 52
2   centimeters, okay? Measurements taken mid-calf
3   bilaterally, right 35 centimeters, left 37 centimeters.
4   BY MR. MARTIN:
5   Q. Okay.
6   A. That's clinically significant atrophy.
7   Q. Two centimeters is clinically significant
8   atrophy?
9   A. Yes, sir.
10  Q. Okay. And did you note that in your expert
11  report?
12  A. This is included as one of the documents in
13  my expert report.
14  Q. How do you define clinically significant?
15  A. Based on my medical training and experience.
16  Q. Plus or minus what?
17  A. I'm sorry, I couldn't hear you.
18  Q. Plus or minus what?
19  A. It's not a matter of plus or minus what.
20  Q. You just -- it's clinically significant
21  because you say it is? There's no principals that we
22  can look at to determine that?
23  A. Clinical accum is based on a history,
24  physical exam, and a diagnosis.
25  Q. So apparently on November 21st, 2005, you

**C.M. SCHADE, M.D. - March 30, 2006**

---

Page 105

1  MR. COLBERT: Objection: Asked and
2  answered.
3  BY MR. MARTIN:
4  Q. Did you ask which leg he had broke?
5  MR. COLBERT: Objection: Asked and
6  answered.
7  A. And as I previously stated, I showed him the
8  documents, and I was more interested in the other one
9  about the cold part than I was about this history, but
10 he neither admitted nor denied anything that was on
11 that page.
12 BY MR. MARTIN:
13 Q. Okay. Well, he's denied it to me under oath
14 that he's broke his leg, so I'm curious as to whether
15 or not he told you or you asked him which leg he had
16 broke.
17 MR. COLBERT: Objection: That's asked
18 and answered.
19 A. I did not inquire about which leg, which
20 wrist, which arm. I merely showed him the documents
21 that I had received.
22 BY MR. MARTIN:
23 Q. Doctor, in your report you have said, But for
24 the on-the-job injury on October 16th, '03, there never
25 would've been the trauma that resulted in items one

Page 106

1  through five, CRPS, right lower extremity; but for the
2  injury on October 16th, '03, there never would've been
3  chronic contractable pain secondary to crush right leg,
4  anxiety secondary to chronic contractable pain,
5  depression secondary to chronic contractable pain,
6  myalgia and myosis -- can't even pronounce it --
7  myositis unspecified status post crush.
8  And you're telling me, in light of that
9  statement there, you didn't even ask him which leg he
10 had broken and how?
11 MR. MARTIN: Objection: Asked and
12 answered.
13 A. That's correct.
14 BY MR. MARTIN:
15 Q. CRPS complicates only one to five percent of
16 all trauma cases often as the consequence of relatively
17 insignificant trauma --
18 THE COURT REPORTER: Okay. Can you slow
19 down a little bit, please.
20 BY MR. MARTIN:
21 Q. CRPS one complicates only one to five percent
22 of all trauma cases, often as a consequence of
23 relatively insignificant trauma with no obvious
24 evidence of nerve damage.
25 Do you agree with that statement?

Page 107

1  A. Yes.
2  Q. Okay. That's contained in the article that
3  you also attached to your report called Mechanism-Based
4  Treatment Complex Regional Pain Syndrome Back to
5  Basics, and that we will ...
6  A. Are you sure it's that article?
7  Q. Yeah. It's on page 71 of that editorial
8  under, Back to Basics.
9  A. There I see it. Thank you.
10 MR. MARTIN: Let's mark that as
11 Exhibit J.
12 MR. COLBERT: I think that's already
13 been introduced into evidence.
14 MR. MARTIN: Not that one. You
15 introduced two, Mark, and I don't know which two, but I
16 don't think this is the one.
17 MR. COLBERT: Okay.
18 MR. MARTIN: So there were three.
19 (Exhibit Number J marked.)
20 BY MR. MARTIN:
21 Q. Do you see further down in that paragraph to
22 which I've just cited, it says, Because of the
23 incidence of CRPS following trauma is relatively low,
24 animal models are needed to efficiently study pain
25 mechanisms and intervention.

Page 108

1  Do you agree with that statement?
2  A. Yes.
3  Q. Dr. Schade, can you say, to a reasonable
4  degree of medical certainty, in light of the fact that
5  Mr. Meadows previously broke his leg, exhibited cold
6  hands and feet on prior occasions to October 16th, '03,
7  that his condition results from the accident on October
8  16th, '03?
9  MR. COLBERT: Objection: Assumes facts
10 not in evidence.
11 A. Yes.
12 BY MR. MARTIN:
13 Q. You still can say that to this day?
14 A. Yes.
15 Q. Is this the roll aid or walker that you
16 prescribed? I'm sorry.
17 A. That's all right.
18 Q. I've attached a --
19 A. Yes, it is.
20 Q. -- copy of a roll aid or walker that I
21 printed off the Internet. Is that a roll aid or walker
22 is?
23 A. Yes.
24 Q. And this is what you prescribed to
25 Mr. Meadows in -- on -- well, the signature on this

C.M. SCHADE, M.D. - March 30, 2006

125

1  learned some new information from Daryl Meadows, right?
2      A.  Yes.
3      Q.  Has it caused you to have any more skepticism
4  about what Mr. Meadows is telling you?
5      A.  No.
6      Q.  Had you asked him, prior to that discussion,
7  whether he had had any previous injuries?
8      A.  I asked him to complete a questionnaire.
9      Q.  And did he ever tell you, before that
10 communication regarding the broken leg, that he had had
11 any previous injuries to his legs?
12     A.  He did not.
13     Q.  And learning that he indeed did have a
14 previous injury of some nature, learning that he had
15 broken his leg didn't cause you to have any more
16 skepticism about what he was telling you?
17         MR. COLBERT:  I object.  That assumes
18 that he broke his leg, and there's no evidence that he
19 broke his leg, so I object to the question, assumes
20 facts not in evidence --
21     A.  No, it did not.
22         MR. COLBERT:  -- and it's been asked and
23 answered.
24     A.  No, it did not.
25 BY MR. MARTIN:

126

1      Q.  Didn't you accept blindly, Dr. Schade,
2  Mr. Meadows' response to your question when you showed
3  him this record that says he broke his leg?
4          MR. COLBERT:  What record is that,
5  Counselor?
6          MR. MARTIN:  Exhibit I.
7          MR. COLBERT:  The work application of --
8          MR. MARTIN:  It's the work application,
9  and it's the one where Mr. Meadows filled out, in his
10 own handwriting, that he broke his leg.
11 BY MR. MARTIN:
12     Q.  Didn't you except blindly his response?
13         MR. COLBERT:  I'm going to object to
14 counsel's comments that Mr. Meadows filled it out in
15 his own handwriting.
16         MR. MARTIN:  There's a signature by
17 Daryl Meadows and that remains to be seen and will be
18 proven.
19         MR. COLBERT:  Same objection.
20     A.  I would not characterize my response in that
21 fashion.
22 BY MR. MARTIN:
23     Q.  You would not say that you accepted blindly
24 his response to your inquiry regarding a previous
25 broken leg?

127

1          MR. COLBERT:  Same objection.
2      A.  That's correct.
3  BY MR. MARTIN:
4      Q.  Did you follow up on it?
5          MR. COLBERT:  Same objection:  Asked and
6  answered.
7      A.  I did not.
8  BY MR. MARTIN:
9      Q.  You did?
10     A.  I did not.
11         MR. MARTIN:  Okay.  I have no further
12 questions.
13         MR. COLBERT:  Doctor, I've got about 45
14 seconds, sir.
15                   EXAMINATION
16 BY MR. COLBERT:
17     Q.  Do the cold feet and hands, that he
18 complained about in the medical records prior to this
19 accident, whether speaking of his working in Alaska,
20 does that have anything to do with this diagnosis of
21 reflex sympathetic history -- dystrophy and chronic
22 regional pain syndrome?
23     A.  In my professional opinion, within reasonable
24 medical probability, it does not.  It doesn't meet the
25 criteria for regional complex pain syndrome.  It's not

128

1  related at all.
2      Q.  Okay.
3      A.  People can have cold feet and doctors don't
4  think of complex regional pain syndrome.
5      Q.  Would a broken leg at some point years before
6  have anything to do with -- with your diagnosis and his
7  current symptoms of chronic regional pain syndrome?
8      A.  No, it would not.  There's no sequelae, and
9  the incidence of CRPS after that kind of trauma is very
10 low.
11     Q.  Lastly, Doctor, have we ever met before Daryl
12 came down here and started treating through you as a
13 board-certified anesthesiologist?
14     A.  No.
15         MR. COLBERT:  That's all I have, sir.
16         MR. MARTIN:  Thank you.
17         THE VIDEOGRAPHER:  This concludes the
18 video deposition of C.M. Schade, M.D.  We're going off
19 the record at 6:44.  This is the end of tape number
20 three.
21         (Exhibit Number M marked.)
22         (Proceedings concluded at 6:44)