**C.M. SCHADE, M.D. - March 30, 2006**

1            IN THE UNITED STATES DISTRICT COURT

2               FOR THE DISTRICT OF ALASKA

3    DARYL MEADOWS,            ) (
                               ) (
4         Plaintiff,           ) (
                               ) (
5    VS                        ) ( CASE NO.: A05-032-CV
                               ) (
6    SCHLUMBERGER TECHNOLOGY   ) (
     CORPORATION,              ) (
7                              ) (
          Defendant.           ) (

8

9

10

11         VIDEOTAPED ORAL DEPOSITION OF C.M. SCHADE, M.D.

12                    MARCH 30, 2006

13

14

15         VIDEOTAPED ORAL DEPOSITION OF C.M. SCHADE, M.D.,

16   produced as a witness at the instance of the Plaintiff,

17   and duly sworn, was taken in the above-styled and

18   above-numbered cause on the 30th day of March, 2006,

19   from 2:47 p.m. to 6:44 p.m., before Lisa J. Gretarsson,

20   CSR in and for the state of Texas, reported by machine

21   shorthand, at the offices of Center for Pain Control,

22   2692 W. Walnut Street, Suite 105, located in the city

23   of Garland, state of Texas, pursuant to the Federal

24   Rules of Civil Procedure and the provisions stated on

25   the record.                    *CONDENSED COPY*

DEFENDANT'S
EXHIBIT

CASE CV-00032-TMB
NO.

EXHIBIT    **AB**
NO.

## C.M. SCHADE, M.D. - March 30, 2006

65

1    Q.  And it had been over two years since the
2  accident by the time he visited with you; is that
3  right?
4    A.  Yes.
5    Q.  So up until that time, as far as treatment,
6  he underwent 13 days of physical therapy with Ardmore,
7  correct?
8    A.  Not correct.
9    Q.  Okay.  Up until the time that he visited with
10  you, please point me to physical therapy outside of
11  those 13 days.
12    A.  I'm just trying to be more clear.
13    Q.  Okay.
14    A.  When we talk about 13 days of therapy, that
15  means 13 days of treatment.  I believe you're talking
16  about a 13-day span.
17    Q.  Thirteen-day window.
18    A.  Thirteen-day window, yes, I agree.
19    Q.  A 13-day window in which he received physical
20  therapy, fair?
21    A.  Well, during that period, yes, not every day,
22  though.
23    Q.  Right.  Seven treatments, to be exact, during
24  that time.  He received one lumbar sympathetic block by
25  Dr. Noe in September of '04; is that right?

66

1    A.  Yes.
2    Q.  Okay.  And he -- he also underwent a surgical
3  procedure by Dr. Montgomery in, I believe it was
4  November of '04.  It was an arthroscopic surgery to his
5  knee.  Is that right?
6    A.  Yes.
7    Q.  Okay.  On that same document, Exhibit D, that
8  we were referring to from Baylor, it says, under pain
9  history, He completed several weeks of physical
10  therapy.  We've established that that's not correct.
11  Do you agree with that?  This would've been April of
12  '04.
13    A.  I don't know how you're measuring your days,
14  but you said 13 days, so ...
15    Q.  Okay.  Several weeks, I suppose you could
16  define that as two weeks, three weeks?
17    A.  Yes.
18    Q.  So we've established that it was 13 days.
19    A.  Yeah.
20    Q.  Okay.  Now, the article -- I'm sorry.  The
21  report by your Center for Pain Control, which we'll
22  label as Exhibit E, it's by Dr. Bradley, I believe.  Do
23  you have that report, Doctor?
24    A.  Yes, I do.
25        (Exhibit Number E marked.)

67

1  BY MR. MARTIN:
2    Q.  Page 2 of that report, first paragraph, it
3  says, The extensive records of that treatment --
4  referring to treatment that Mr. Meadows received before
5  coming to your clinic -- indicate no improvement of his
6  pain.  Because the patient's pain did not improve, he
7  was eventually referred to Dr. Schade.  Do you see
8  that?
9    A.  Yes.
10    Q.  Mr. Meadows was not referred to you by
11  another doctor, was he?
12    A.  No, he was not.
13    Q.  He was referred to you by Mr. Colbert,
14  correct?
15    A.  Correct.
16    Q.  And as far as the extensive records of
17  treatment indicating no improvement, it just talks
18  about what types of treatment he received that
19  demonstrated no improvement, correct?
20    A.  I don't understand the question.
21    Q.  Well, Ardmore Physical Therapy, the treatment
22  he received from Dr. Noe, that would be the extensive
23  treatment pattern before coming to see you?
24    A.  That's part of the treatment he received.
25    Q.  He also received an MRI -- I'm sorry, not an

68

1  MRI -- the arthroscopic surgery, that we've talked
2  about, by Dr. Montgomery in November of '94, but no
3  other treatment, per se, before coming to see you;
4  isn't that right?
5    A.  I'm not trying to be argumentative, but he
6  was given prescriptions.  He did, you know, have
7  treatment plans laid out by his doctors, as reflected
8  in the medical records.
9    Q.  Okay.  Treatment plans laid out by his
10  doctors for which we have no records to show whether he
11  followed through or not, do we?
12    A.  No.
13    Q.  November 28th, 2005, Mr. Colbert wrote you a
14  letter, which we'll mark as Exhibit F.
15        (Exhibit Number F marked.)
16  BY MR. MARTIN:
17    Q.  And here is your copy, just to refer to.
18        The letter says, Dr. Schade, per our
19  representation of Daryl in the above-referenced action,
20  which resulted from an explosion on October 16th, '03,
21  this letter guarantees payment of the above-referenced
22  account from the settlement funds obtained in this
23  action.
24        Did you obtain this letter?
25    A.  Yes.

C.M. SCHADE, M.D. - March 30, 2006

69

1    Q.   Is that your understanding, is that you're
2  guaranteed payment for anything you do in the way of
3  treatment?
4    A.   Provided there's sufficient funds to pay for
5  it.
6    Q.   The next page in that Exhibit E is another
7  letter to you from Mr. Colbert, and it indicates --
8  there's actually -- I have three of the same letter.
9  I'll just take two of those out.  Obviously the one is
10 the only one I'm interested in.  And that sets forth
11 the items required under Rule 26 that should be
12 included in your report; is that right?
13   A.   Yes.
14   Q.   And then the last item in that Exhibit shows
15 what your fees are.  Do you see that?  It's on your
16 three-page -- it looks like a three-page agreement
17 regarding retention of your services.
18   A.   I see that.
19   Q.   On page 2, your hourly rate is $400 an hour
20 for consulting and review of records, $400 an hour for
21 travel to trials, $400 an hour with a four-hour
22 minimum; is that right?
23   A.   Yes.
24   Q.   You're an expert in this case, correct?
25   A.   Yes.

70

1    Q.   Okay.  I want to show you another one of
2  those articles that you included in your -- in your
3  report.  And this pertains to the issue of physical
4  therapy, which we've been discussing.
5         I wanted to ask, if you would -- because
6  I think it's pretty interesting.  There is a test at
7  the end of this.  It looks to me like what would be
8  something like what we lawyers do as CLEs.
9         This is a test for doctors.  It says,
10 Appendix one survey, and it has a test in there.  It
11 looks like an MLE of some sort.  Is that what doctors
12 do for continuing medical -- CMEs?  Is that what they
13 call them?
14   A.   Yes.
15   Q.   Okay.  Is that a CME type of quiz or survey?
16 Is that something you do to get CME credit?
17   A.   No.
18   Q.   Okay.  What is that survey for there?
19   A.   I believe that is the survey that was used to
20 collect the data that's reported in this article.
21   Q.   Okay.  And is this -- this is a survey that
22 one would conduct after reading the article to see if
23 they've understood the article from a medical
24 standpoint?
25   A.   No.

71

1    Q.   Okay.  Appendix one survey, and it has 1
2  through 33, and there's blanks for answers.  Who is to
3  fill this out?
4    A.   I refer you to page 75 of the article --
5    Q.   Okay.
6    A.   -- under methods.
7    Q.   Seventy-five.  Okay.
8    A.   Quote, The authors piloted a 36-item survey
9  on 15 specialists.  Based on their feedback, the survey
10 was revised to take between 15 and 20 minutes.  The
11 final survey (Appendix 1) was then mailed to
12 interventional pain specialists that have treated at
13 least five CRPS patients during the preceding year, end
14 of quote.
15   Q.   You fall in that category, right, pain
16 specialist?
17   A.   I don't understand.  I didn't receive the
18 survey, no.
19   Q.   Okay.  You fall under the category of pain
20 specialists who have treated more than five CRPS
21 patients in the last -- what is it, year?  Is that what
22 it was?
23   A.   That's what it was.
24   Q.   Okay.  You fall into that category, don't
25 you?

72

1    A.   Yes.
2    Q.   And so you could fill out the survey.
3    A.   Yes.
4    Q.   Okay.  Go to page 83.  And if you could,
5  then, please respond to the survey, where it says --
6  it's presented a scenario, and it says, His diagnosis
7  is late-stage CRPS type I or RSD.
8         That's what Mr. Meadows -- you diagnosed
9  Mr. Meadows with, correct?
10   A.   I don't know which paragraph you're on.
11   Q.   Okay.  It's on page 83.
12   A.   Yes.
13   Q.   At the very end of scenario three.  The
14 diagnosis is late-stage CRPS type I or RSD.  Is that
15 not what you diagnosed Mr. Meadows with, CRPS type I?
16        MR. MARTIN:  This will be Exhibit G.
17        (Exhibit Number G marked.)
18 BY MR. MARTIN:
19   Q.   Go ahead.
20   A.   To answer your first question, scenario
21 three --
22   Q.   Uh-huh (affirmative).
23   A.   -- of the 35-year-old male does not resemble
24 Mr. Meadows.
25   Q.   Okay.  So assume that's true.  Is not --