1                IN THE UNITED STATES DISTRICT COURT

2                    FOR THE DISTRICT OF ALASKA

3   DARYL MEADOWS,                    )
                                      )
4                    Plaintiff,       )
                                      )
5      vs.                            )
                                      )
6   SCHLUMBERGER TECHNOLOGY           )
    CORPORATION,                      )
7                                     )
                     Defendant.       )
8   _____ )
    Case No. A05-032-CV

9
                          **VOLUME I**
10
       **30(b)(6) DEPOSITION OF BRITISH PETROLEUM (ALASKA)**
11                       **DON A. ENSLOW**

12  APPEARANCES:

13     **FOR THE PLAINTIFF:**          **MR. ROBERT A. SPARKS**
                                       Law Office of Robert A. Sparks
14                                     1552 Noble Street
                                       Fairbanks, Alaska 99701
15                                     (907) 451-0875

16     **FOR THE DEFENDANT:**          **MR. SHANNON W. MARTIN**
                                       Lane Powell PC
17                                     Attorneys at Law
                                       301 West Northern Lights Blvd.
18                                     Suite 301
                                       Anchorage, Alaska 99503
19                                     (907) 264-3318

20     **FOR THE WITNESS:**           **MR. GREGORY L. YOUNGMUN**
                                       DeLisio Moran Geraghty & Zobel
21                                     Attorneys at Law
                                       943 West Sixth Avenue
22                                     Anchorage, Alaska 99501
                                       (907) 279-9574

23

24

25


                    R & R   C O U R T   R E P O R T E R S

                              810 N STREET
                      (907) 277-0572/Fax 274-8982

                        ANCHORAGE, ALASKA  99501

1        PURSUANT TO NOTICE, the Deposition of **DON A. ENSLOW,**

2   was taken on behalf of the Plaintiff in a **30(b)(6) DEPOSITION**

3   **OF BRITISH PETROLEUM (ALASKA)**, before William Rice, Notary

4   Public in and for the State of Alaska, and Reporter for R & R

5   Court Reporters, Inc., at the offices of R & R Court Reporters,

6   810 N Street, Anchorage, Alaska, on the 29th day of August,

7   2005 commencing at the hour of 1:30 o'clock p.m.

8                        * * * * * *

9                      TABLE OF CONTENTS

10  Direct Examination by Mr. Sparks                              04

11  EXHIBITS:

12    1  - Investigation Report dated 10/16/03                    04
      2  - Investigation Report (Final) 10/16/03                  13
13    3  - Investigation Report - draft                          62
      4  - Incident Report 2003-IR-651141                        67
14    5  - Investigation Report -Don Enslow's file               96
      6  - Findings, Causes and Recommendations                 103
15    7  - Handwritten notes BPXA 00108                         107
      8  - McBride's notes                                       109
16    9  - Attachment #5 employee statements                    121
     10  - Filbury statement                                     124
17   11  - Interview notes                                       125
     12  - Lott statement                                        127
18   13  - Calculations chart - notes                           128

19                        * * * * * *

20

21

22

23

24

25

3

P R O C E E D I N G S

1
2          (On Record)

3                    COURT REPORTER:  The time is approximately 1:49

4    p.m.  Today is August 29th, 2005.  We're at the offices of R &

5    R Court Reporters at 810 N Street for the 30(b)(6) Deposition

6    of BRITISH PETROLEUM (ALASKA) taken on behalf of the Plaintiff

7    in the United States District Court case Daryl Meadows versus

8    Schlumberger Technology Corporation, Case No. A05-032 Civil.

9    My name is Bill Rice.  I'm a Court Reporter for R & R Court

10   Reporters at 810 N Street and a Notary Public for the State of

11   Alaska.

12                    Sir, would you raise your right hand, please?

13          (Oath administered)

14                    MR. ENSLOW:  I do.

15                         **DON A. ENSLOW**

16   having been first duly sworn under Oath, testified as follows

17   on:

18                    **DIRECT EXAMINATION**

19                    COURT REPORTER:  You may lower your hand.  Will

20   you state your full name for the record, please and spell your

21   last?

22   A       The name is Don, D-o-n, initial A, Enslow, E-n-s-l-o-w.

23                    COURT REPORTER:  Do you have a telephone number

24   where you can be reached during the daytime?

25   A       Yes, 564-5495.

4

1     COURT REPORTER:  And a mailing address, please?

2  A     900 East Benson Boulevard, Mail Stop 11-6, Anchorage,

3        99508.

4            COURT REPORTER:  Thank you.  Counselors, if

5  you'll identify yourselves for the record you may proceed.

6            MR. SPARKS:  This is Robert Sparks, I represent

7  the Plaintiff Daryl Meadows.

8            MR. MARTIN:  Shannon Martin, I represent

9  Schlumberger Technology Corporation.

10           MR. YOUNGMUN:  Greg Youngmun with BP Legal

11 Department.

12           COURT REPORTER:  Thank you.

13           MR. SPARKS:  Would you mark that one as the

14 first exhibit.  You guys are going to have to share, I didn't

15 know there was going to be two attorneys.

16                          **(Deposition Exhibit 1 marked)**

17           MR. SPARKS:  Thanks, there is an extra one.

18 **BY MR. SPARKS:**

19 Q     Okay.  This is Exhibit 1 to your deposition, sir, and

20        this is the 30(b)(6) deposition for this case, are you

21        the one that's been designated by BP Exploration Alaska

22        to testify on their behalf regarding the facts and

23        opinions regarding the investigative report titled

24        Investigation Report Northstar Well 29 Wireline Valve

25        Incident dated October 16th, 2003?

1  A    Yes, that's correct.

2  Q    Have you reviewed any documents prior to your

3      deposition?

4  A    Yes, I have.

5  Q    What documents have you reviewed?

6  A    The incident report itself and some information that I

7      had in my file that I believe has been disclosed.

8  Q    Do you have those documents with you?

9          MR. MARTIN:  I have a copy of the documents

10  that were produced.  I -- I brought those, he didn't.

11  Q    (By Mr. Sparks)  What documents did you review other

12      than the incident report that you can recall?  How do

13      you know they were already produced?

14  A    Information, some witness testimony from the

15      investigation, some diagrams that were drawn up during

16      the investigation, photos taken during the

17      investigation, and some vendor information regarding

18      the Bowen hydraulic wireline valve.

19  Q    So where was that information?  Was it in a file

20      someplace, how did you get access to it to review prior

21      to your deposition?

22  A    The information was in a file that I, myself, had kept

23      because of my involvement with the investigation.

24  Q    Okay.  Did you provide a copy of that file to anyone

25      else previously?

6

1  A       Yes, I provided it to my legal staff.

2  Q       A complete copy of the file?

3  A       Yes.

4  Q       And how many pages is in that file, do you know?

5  A       I don't know offhand.

6                MR. SPARKS:  Well, I think since we're entitled

7  to the documents and -- and I'm not sure that he's -- that he's

8  referring to the same documents that were produced I'd like to

9  have the witness' copies of the documents produced.  Do you

10  guys have a problem with that?

11                MR. MARTIN:  This is -- the copy that was

12  produced is the witness' copy.

13                MR. SPARKS:  Were documents taken out of that

14  that were retained for privileged purposes?  I need -- if the

15  witness reviewed a complete copy of the file prior to their

16  deposition I think I'm entitled to a complete copy of the file

17  that he reviewed.

18                MR. MARTIN:  He's -- he's reviewed the

19  documents that he said were in his file and those are the

20  documents that were turned over to us.  There's been no

21  documents withheld as privileged.

22                MR. SPARKS:  Okay.

23  Q       (By Mr. Sparks)  Have you had any meetings with anybody

24          prior to your deposition today about the incident?

25  A       Yes, I have.

7

| | | |
|---|---|---|
| 1 | Q | And who did you have meetings with? |
| 2 | A | With my legal counsel. |
| 3 | Q | And who is that? |
| 4 | A | Both with Mr. Youngmun and with Mr. Martin. |
| 5 | Q | Have you had your deposition taken previously? |
| 6 | A | I have not. |
| 7 | Q | Well, what's happening -- going to happen is I'm going |
| 8 | | to ask questions, hopefully you can answer some of the |
| 9 | | questions.  Your Counsel may ask some questions.  If |
| 10 | | your answers at trial differ from your answers here |
| 11 | | today at your deposition you may be asked to explain |
| 12 | | the differences, do you understand that? |
| 13 | A | Yes. |
| 14 | Q | If I say -- if I ask a question -- some people say I |
| 15 | | mumble, if I ask a question you can't hear the whole |
| 16 | | question I don't want you to guess at what I'm asking, |
| 17 | | I want you to tell me I didn't hear that question, |
| 18 | | could you repeat it.  Could you do that for me? |
| 19 | A | Yes. |
| 20 | Q | If I don't -- if I'm not talking loud enough and if you |
| 21 | | can't hear the question or if it's not clear, can you |
| 22 | | do the same thing?  Don't answer the question.  Tell me |
| 23 | | I didn't hear that question and repeat that for me. |
| 24 | | Can you do that? |
| 25 | A | Yes, I can. |

1  Q    If you don't understand the question or if there's
2       something confusing about the way the question was
3       asked I'd rather have you say I don't understand that
4       question or that's confusing instead of trying to guess
5       at what I'm asking.  Okay?
6  A    I understand.
7  Q    And who's your employer?
8  A    BP.
9  Q    How long have you worked for BP?
10 A    Fifteen years.  I worked with ARCO Alaska for 10 years
11      and then we merged with BP so I've actually been in
12      BP's employ for five years, but I have 15 years tenure.
13 Q    And what's your current position?
14 A    Senior safety consultant.
15 Q    How long have you been a senior safety consultant?
16 A    In this -- I've been in this position for two years.
17 Q    What qualifications do you have that got you employed
18      as the senior safety consultant?
19 A    I have 27 years experience as a safety professional.
20      I'm certified by a national recognized board of
21      certified safety professionals.  I'm a CSP.  And I have
22      20 years experience in the oil industry.
23 Q    Besides ARCO and BP who have you worked for in the oil
24      industry?
25 A    Phillips Petroleum.

9

| | | |
|---|---|---|
| 1 | Q | What years did you work for Phillips? |
| 2 | A | 1978 to 1980. |
| 3 | Q | Who else have you worked for? |
| 4 | A | Mobil Oil 1980 to 1981.  Texas Oil & Gas Corporation |
| 5 | | 1981 to 1982.  Aramco, Arabian American Oil Company, |
| 6 | | 1982 to 1984.  Then I was in -- with the -- I worked |
| 7 | | with a public utility and with the Department of Energy |
| 8 | | for six years prior to coming to Alaska. |
| 9 | Q | Was that on a specific project or what was your |
| 10 | | position there? |
| 11 | A | I was a safety engineering supervisor with EG&G which |
| 12 | | is a prime contractor for the Department of Energy. |
| 13 | Q | What were you working on with them? |
| 14 | A | Nuclear -- nuclear research. |
| 15 | Q | Is that safety related? |
| 16 | A | Yes, it was. |
| 17 | Q | Have you ever been terminated involuntarily from any |
| 18 | | positions or asked to resign? |
| 19 | A | No, I haven't. |
| 20 | Q | Have you been -- have you ever been charged with |
| 21 | | (indiscernible) fraud? |
| 22 | A | No, I haven't. |
| 23 | Q | Have you ever been charged with any felonies? |
| 24 | A | No. |
| 25 | Q | It seems like a lot of your positions in the oil |

1  industry were for a short time periods with the other

2  companies and you worked, I guess, for 10 years for

3  ARCO.  Can you explain briefly why it was just a couple

4  of years that you worked at, it looks like, Phillips,

5  worked a year at Mobil, worked a year at Texas Oil &

6  Gas Corp., worked two years at Aramco?  Home come your

7  employment periods were so short there?

8 A I think it's the cyclic nature of the oil industry, the

9  booms and busts.  We -- in the time that I graduated

10  from college and worked in the oil field there was lots

11  of different opportunities.  People changed positions,

12  changed companies quite frequently.  Two of my

13  assignments were international.  The one with Phillips

14  Petroleum was in Norway and I worked offshore and then

15  I worked in Saudi Arabia.

16 Q Have you been involved in the investigation of any

17  other incidents involving personal injuries that

18  occurred as a result of use of a wireline blowout

19  prevention device?

20 A No, I haven't.

21 Q Do you know of any other incidents that have occurred

22  like that?

23 A No.

24 Q Is the incident that's the subject of this lawsuit the

25  only personal injury incident that you're aware of that

11

| | | |
|---|---|---|
| 1 | | occurred while you've been employed with BP involving a |
| 2 | | blowout prevention device? |
| 3 | A | That's correct. |
| 4 | Q | Who -- I understand this investigation report was |
| 5 | | drafted and then who did the final approval for the |
| 6 | | final draft of the report about the October 17 |
| 7 | | incident? |
| 8 | A | The final approval was by Tom Gray who at the time was |
| 9 | | the delivery manager for Northstar. |
| 10 | Q | BP employee? |
| 11 | A | Yes. |
| 12 | Q | Does he still work for the company? |
| 13 | A | Yes. |
| 14 | Q | Where's he work at do you know? |
| 15 | A | I don't remember.  He's -- he's not in the state |
| 16 | | anymore. |
| 17 | Q | What's a root cause? |
| 18 | A | A root cause is anything that contributed to property |
| 19 | | loss or injury in an incident that if prevented would |
| 20 | | have either not allowed -- an incident wouldn't have |
| 21 | | happened or it would have been this -- would have been |
| 22 | | less severity. |
| 23 | Q | So are you trained in root cause analysis? |
| 24 | A | Yes. |
| 25 | Q | And how much training have you had in root cause |

```
 1        analysis?
 2   A    I've had training -- I have to think about this for a
 3        minute because I've had over the course of my career
 4        probably six specialized training courses just on root
 5        cause analysis, and then my experience investigations
 6        themselves.
 7   Q    When's the most recent training you had in root cause
 8        analysis?
 9   A    In April of this year, 2005.
10   Q    How about prior to that, what was the next most recent
11        class or training that you had in root cause analysis?
12   A    I don't remember the exact time date.  It's been within
13        the last five years.
14   Q    Was it prior to or after October 17th, 2003?
15   A    It was prior to.
16   Q    Where did you receive that training at?
17   A    Received it from -- actually within BP we have a
18        training course called root cause analysis.  And prior
19        to that I was a investigation instructor with a
20        training called Tap Root.
21   Q    What's Tap Root?
22   A    Tap Root is a method of doing root cause analysis.
23   Q    Is that a BP program or what's Tap Root?
24   A    Tap Root was -- was an ARCO program that was also used
25        by BP.  After my first year with BP they changed their
```

1    analysis program to what they call RCA or root cause

2    analysis.

3 Q  Can you summarize for us the difference between the Tap

4    Root and the RCA, is it different?

5 A  They both use what they call a pick list which is a

6    checklist of questions and potential failures that

7    could happen in an incident that allows you -- gives

8    you a structured way of analyzing data from the

9    incident.  The root cause analysis has something called

10   a comprehensive list of causes or CLC chart that is

11   more comprehensive that what Tap Root uses as their

12   pick list.  Tap Root has a better -- they have a more

13   structured method of mapping an incident.  Where root

14   cause analysis used what they call building blocks to

15   map an incident.

16     MR. SPARKS:  Mark that as the next exhibit.

17 I've got one copy of that.

18     COURT REPORTER:  Exhibit 2.

19          **(Deposition Exhibit 2 marked)**

20 Q  (By Mr. Sparks)  This is marked as Exhibit 2.  Do you

21   know if that's a copy of the final report?

22 A  Yes, it is.

23   (Cell phone ringing)

24     COURT REPORTER:  Sorry.  Can we go off the

25 record for a moment?

14

1          MR. SPARKS:  Sure.

2      (Off record)

3      (On record)

4  Q   (By Mr. Sparks)  Is the purpose of root cause analysis

5      to attempt to prevent reoccurrence of the incidents?

6  A   Yes, that's correct.

7  Q   Okay.  And in the root cause analysis what are critical

8      factors?

9  A   Critical factors are what we would call events or

10     conditions that if taken away would not have allowed

11     the incident to happen, or the incident wouldn't have

12     been as severe.

13  Q  What are immediate causes?

14  A   Immediate causes are occurrence -- things that happen

15     that can be corrected normally very quickly, but

16     perhaps don't get down to the actual root of the

17     incident.  As an example, you can damage your vehicle

18     by driving through a pot hole, an immediate cause would

19     be that there's a hole in the street, but the actual

20     root cause may be the maintenance program for the road.

21  Q  How about a system cause?

22  A   A system cause then is the -- it's called a system

23     cause but when we look at that we look at our -- our

24     processes that we use to make sure that we have -- we

25     operate safely, so we look at our processes or systems

15

| | | |
|---|---|---|
| 1 | | to see if there was a failure in those that contributed |
| 2 | | to the incident. |
| 3 | Q | I want to look at Exhibit 2 here at page 5. This is -- |
| 4 | | are these the findings from the analysis? |
| 5 | A | Yes, they are. |
| 6 | Q | Okay. And critical factor - 1, the lubricator wireline |
| 7 | | valve assembly created an unobvious hazard. Why did |
| 8 | | you determine that the lubricator wireline valve |
| 9 | | assembly created an unobvious hazard was a critical |
| 10 | | factor number 1? Did you determine that or did the |
| 11 | | whole committee determine that? |
| 12 | A | The team. It's determined by a team. |
| 13 | Q | So how was -- is it -- does it make a difference |
| 14 | | whether it's critical factor 1, 2 or 3? |
| 15 | A | No, it doesn't. In the opinion of the investigation |
| 16 | | team if anyone of these critical factors would have |
| 17 | | been -- would not have occurred then the incident may |
| 18 | | have been prevented or it would have been as severe. |
| 19 | Q | So why -- why was it -- do you know why it was |
| 20 | | determined that the lubricator wireline valve assembly |
| 21 | | created an unobvious hazard? |
| 22 | A | The hazard was not recognized by the crew on the floor |
| 23 | | at the time. |
| 24 | Q | That was the..... |
| 25 | A | And that was -- so it was not obvious. |

16

1  Q        That was the Schlumberger crew?

2  A        Yes.

3  Q        And how did the immediate causes work with critical

4           factor 1?  Are those supporting factors or how --

5           what's the relation between critical factor 1 and the

6           list of immediate causes underneath critical factor 1?

7  A        The root cause analysis process uses this comprehensive

8           list of causes or the CLC chart.  At the top of the

9           chart is what they call the immediate causes and

10          there's several categories that you -- that you walk

11          through and evaluate and there's definitions that are

12          provided for each of those categories.  And then you

13          try -- as a team you identify which one of those causes

14          were contributors to this critical factor.  And those

15          are the five that we selected in the list of immediate

16          causes from the -- from the CLC chart.

17 Q        Okay.  The 2-5 improper use of tools, equipment or

18          materials bleed valve closed, who was responsible for

19          that?

20 A        That would have been the Schlumberger crew in operation

21          of the valve.

22 Q        Okay.  How about immediate cause 3-1 lack of knowledge

23          of hazards present, who was responsible for that?

24                  MR. MARTIN:  Object, overbroad.  Go ahead and

25 answer if you can.

17

1    A    I think that it is a -- it's the ultimate

2         responsibility of the -- of the driller on the rig

3         floor to -- to understand what's going on.  And -- and

4         in communication with the crew, the Schlumberger crew,

5         any one of the -- those employees had the

6         responsibility to recognize the hazard, but the driller

7         being ultimately responsible for the activities on the

8         rig floor.

9    Q    So you're saying that the lack of knowledge of the

10        hazards present refer to the driller, not to the

11        Schlumberger crew for immediate -- for the immediate

12        cause that's listed there, 3-1, lack of knowledge of

13        hazards present it's your testimony here today under

14        Oath with penalty of perjury that that is supposed to

15        be referring to something that the driller did or

16        didn't do?

17   A    I said it's -- I believe it's a -- the knowledge should

18        have been present by both the driller and the

19        Schlumberger crew.

20   Q    Who was working on the wireline valve at the time that

21        it -- that this incident occurred?

22   A    The Schlumberger crew.

23   Q    Okay.  And was the Schlumberger crew that was working

24        on the wireline valve, did you determine whether they

25        had a lack of knowledge of the hazards present?

18

1           MR. MARTIN:  Objection, asked and answered.

2   Q    (By Mr. Sparks)  That's just for the record.  You can

3        ignore objections unless he tells you not to answer or

4        your attorney tells you not to answer.  Can you answer

5        that question?

6   A    Can you rephrase the question?

7   Q    When it says 3 dash -- well, let's go back.  So you'd

8        agree that the Schlumberger crew that was present doing

9        this work on the wireline valve had a lack of knowledge

10       of the hazards that were present, correct?

11  A    And it's specifically talking about the bleed valve.

12       The -- the specific reference here is that they -- they

13       were unaware that the bleed valve was closed.

14  Q    Okay.  And that's the improper use of tools, equipment

15       or materials referred to referred to above on 2-5, the

16       bleed valve was closed, 3-1, lack of knowledge of

17       hazards present.  It doesn't say anything about the

18       bleed valve on that line, does it?

19  A    This is generic language that's used on a CLC chart for

20       -- for any incident that you have so it -- it's not

21       going to -- it's not going to say bleed valve closed on

22       there.  It's the language that we took off the chart.

23  Q    Who had the training as far as -- did -- the Nabors

24       crew wasn't trained on how to operate the valve lines,

25       were they?

19

1  A    No, but the Nabors crew was aware that there was

2       potential pressure leaking from the master valve.

3  Q    So the swab valve was above that, wasn't it?

4  A    Yes.

5  Q    And to -- and in your investigation you determined that

6       the swab valve was closed at the time of this incident,

7       correct?

8  A    That's correct.

9  Q    And there wasn't any indication that anyone on the

10      Nabors crew or the driller for the Nabors crew was

11      aware that there was any leaking from the swab valve at

12      the time this wireline work was being done by the

13      Schlumberger crew, correct?

14 A    I don't know that, but.....

15          MR. MARTIN:  Object to the form.

16 A    I don't know that, but I would not say that was

17      correct.  There was at least.....

18 Q    (By Mr. Sparks)  So if you don't.....

19 A    It was.....

20 Q    .....know why are you saying that you don't think it's

21      correct?

22 A    If you -- if you read through the witness statements

23      and the information that was provided there was some

24      concern and the -- that the swab valve was suspect and

25      could be leaking.

1  Q    Who said that?

2  A    I've got to go back and read through the material.  I

3       couldn't tell you right offhand.

4  Q    Well, I've got all the statements here.  We'll go

5       through those and we'll determine that.  And it's your

6       testimony that -- that the driller was aware the swab

7       valve could be leaking at the time of this incident?

8  A    What we were told during the investigation is that

9       anyone that works on a drilling rig is taught not to

10      trust master valves or swab valves because they know

11      that at any time they can leak.

12 Q    So Schlumberger should have been well aware of that and

13      instructed their crew to be aware that there could be

14      leaks, correct?

15          MR. MARTIN:  Objection, speculation.  Form.

16 Q    (By Mr. Sparks)  Can you answer that question?

17 A    Everyone on the rig floor should have been aware of

18      that.

19 Q    So even if there was no problem detected with the

20      master valve or -- and no problem detected with the

21      swab valves the Schlumberger crew should have been

22      concerned that those could have been leaking and

23      allowing pressure into the wireline device, correct?

24          MR. MARTIN:  Objection, foundation,

25 speculation.

21

1  A    (No audible response)

2  Q    (By Mr. Sparks)  Move to the next one, 3-7, disabled

3       guards or warning devices.  It says gauge relocated

4       below swab valve.  What's this referring to?

5  A    At the time -- prior to the Schlumberger crew showing

6       up on the rig floor, when they were doing their well

7       work they had a gauge on the rig floor to allow them to

8       determine whether there was pressure or not.  When the

9       Vetco-Gray employee showed up to grease the master

10      valve to do the work he needed to do, he -- he used the

11      gauge and took it down to the -- below the -- from the

12      cellar.

13 Q    So was it -- so was there a policy of procedure that

14      the gauge was supposed to be installed prior to

15      Schlumberger performing this work?

16 A    Not that I know of.

17 Q    And where was -- where would the gauge have been

18      located?  Would it have been located on the blowout

19      prevention device or on what -- what equipment would it

20      have been located on?

21 A    The only thing I know -- I don't -- I'm not technically

22      knowledge of that, the exact location where the gauge

23      would be, but I know it would have been above the swab

24      valve.

25 Q    So if the blowout prevention device had already been

22

1   removed and was being worked on on the rig floor the

2   gauge would have been -- wouldn't have been any

3   assistance in determining whether the blowout

4   prevention device had pressure in it at that time,

5   would it?

6  A   I -- can you rephrase your question?

7  Q   Well, my understanding is when this incident occurred

8   the blowout prevention device was on the rig floor

9   being worked on, it wasn't attached to the -- it wasn't

10  part of the rig at that time, that it was detached and

11  it was being worked on on the rig floor, is that your

12  understanding?

13  A   That's not my understanding.

14  Q   So it was -- was the -- is it your understanding that

15  the blowout prevention device was still hooked up to

16  the rig piping at the time the slide-lok plates were

17  being taken off of it?

18  A   Yes, that's correct.

19  Q   Whose responsibility is to ensure that guards or

20  warning devices are in proper order prior to work being

21  completed?  Would that be the responsibility of the

22  company that's doing the work such as Schlumberger in

23  this situation?

24          MR. MARTIN:  Object to the form.

25  A   The ultimate person responsible for activities on the

1           rig floor is the driller.

2    Q    (By Mr. Sparks)  But he's not supposed to hold

3           everybody's hand and make sure they do their job, does

4           he?

5    A    There is some confidence or assurance that, yes, that's

6           provided by Schlumberger who comes in and has spe- --

7           does special work.

8    Q    And the driller isn't specially trained in how these

9           wireline valves oper- -- are supposed to be assembled

10        and disassembled, is he?

11             MR. MARTIN:  Objection, speculation.

12    A   If you could rephrase the question.

13    Q   The Schlumberger crew is supposed to be the experts on

14        how to service these wireline valves, correct?

15    A   Correct.

16    Q   And the driller from Nabors should be able to rely on

17        the Schlumberger crew being trained in the proper

18        safety procedures for assembling and disassembling the

19        blowout prevention devices, shouldn't he?

20    A   That's correct.

21    Q   Do you know if anyone from Schlumberger told the

22        driller that they needed to have a gauge reinstalled or

23        to have the gauge relocated above the swab valve?

24    A   No, I don't.

25    Q   Okay.  And then the next immediate cause listed is 4-1,

```
 1              decision to proceed without first evaluating hazards.

 2              What's your understanding that that refers to?

 3   A          There was acceptance by the work crew to proceed with

 4              their activity of removing the rams from the wireline

 5              valve with -- both by the work crew and also by the

 6              driller who allowed simultaneous operations on the rig

 7              floor at the same time with the Vetco-Gray hand down

 8              below.  So there was a combination of factors that were

 9              going on at that time that should have been recognized

10              by individuals responsible to say time out.

11   Q          So you'd agree that the driller doesn't have the same

12              level of training on these wireline blowout prevention

13              devices as the Schlumberger crew does, wouldn't you?

14   A          Yes.

15   Q          And wouldn't you agree that the per- -- the people that

16              have the most knowledge about what the potential

17              hazards are from disassembling one of these blowout

18              prevention devices would be the Schlumberger crew that

19              was sent to service the blowout prevention device by

20              the Schlumberger company?

21                  MR. MARTIN:  Object to the form of the

22   question.

23   A          Schlumberger was hired to do the job.

24   Q          (By Mr. Sparks)  Well, as part of doing the job aren't

25              they supposed to know how to do the job safely, isn't
```

25

1         that a requirement?

2 A     Yes.

3 Q     So they're the ones that make the decision to proceed

4         after they've evaluated the particular hazards with the

5         -- this highly technical piece of equipment that

6         they're working on, aren't they?

7 A     I'm sorry, say the question one more time.

8 Q     Well, the driller isn't the one that's in the position

9         to know what the risks particularly of disassembling of

10        this wireline valve --  this wireline blowout

11        prevention device, is he?

12             MR. MARTIN:   Object to the form of the

13 question.

14 A    The driller is in a position to know the hazards that

15       they -- that may be coming up from the well formation.

16       And -- and what could be -- what could be potential

17       exposures to a contract crew that is working with --

18       with the wireline valve.

19 Q    (By Mr. Sparks)  And the driller had the swab valve

20       closed, correct?

21 A    Correct.

22 Q    And if the driller wasn't aware that there was any leak

23       from the swab valve he was -- he would be in a

24       situation not -- well, let's assume that there was

25       excessive pressure in the blowout prevention device and

26

1        that it shouldn't have been disassembled, if the

2        Schlumberger crew had known that there was -- if they

3        had even known that there was any pressure in this well

4        they should have relieved the pressure on the blow out

5        prevention device before it was disassembled, correct?

6                MR. MARTIN:  Objection to form, foundation,

7    improper hypothetical.

8    A   I -- I got confused I'm sorry, when you said let's

9        assume.

10   Q   (By Mr. Sparks)  Well, if -- even if driller had turned

11       off the master valve and the swab valve was turned off

12       before the Schlumberger crew started disassembling the

13       blowout prevention device they should have relieved the

14       pressure on it, made sure that it didn't have any

15       pressure inside of it, correct?

16   A   That's correct.

17   Q   And then 501, master and swab valves leaking.  Is that

18       what allowed the pressure to leak into the blowout

19       prevention device, is that what was determined?

20   A   That's correct.

21   Q   And then the system causes, 3-1, decision to proceed

22       without first evaluating hazards.  Who was in the best

23       -- wasn't Schlumberger in the best position to evaluate

24       what the hazards were.....

25                MR. MARTIN:  Objection.